*NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| TIEHEEN FLETCHER, | : | |
| | : | |
| Petitioner, | : | Civil Action No. 15-3237 (JLL) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| PATRICK NOGAN, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**LINARES**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Tieheen Fletcher ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court conviction (ECF No. 1). Respondents filed a response to the petition (ECF No. 8), to which Petitioner has replied (ECF No. 13). For the following reasons, this Court will deny both the petition for a writ of habeas corpus, and no certificate of appealability shall issue.

## I.  BACKGROUND

In the opinion affirming Petitioner's conviction on direct appeal, the Superior Court of New Jersey – Appellate Division provided the following summary of the facts underlying Petitioner's conviction:

> Early in the morning of August 8, 1997, at Avon Avenue and 12th Street in Newark, [Petitioner] shot and killed Gregory Brantley who was in the area because he was buying a home at 368 Avon Avenue.
>
> Michael Joyner, who was at the corner of 12th Street and Avon with Elizabeth Kurbansade and Glenn Gray, heard "some guys" [Petitioner and Brantley] arguing, "about some drugs" about

two to three minutes before the shooting, in front of a bar or a house on the corner of 11th Street and Avon, about fifty feet from where Joyner was standing.  After the men stopped arguing, [Petitioner] walked up 12th Street past Joyner.   Brantley greeted Gray as he got into his car and drove away.   All three witnesses then heard gunshots.  Kurbansade heard about eight shots, Joyner heard four or five, and Gray heard an unspecified number, but saw Brantley's car swerve and crash.   Gray and Kurbansade then started to run, and Fletcher ran past Gray on 12th Street and turned on Avon.   Joyner testified that as [Petitioner] was coming towards him [Petitioner] said, while placing a silver looking gun in his waistband, that "he got his fat ass."

All three witnesses gave statements to the police. Kurbansade's August 14, 1997 statement, which she later partially recanted, said [Petitioner] was holding a gun in his right hand as he was running.   Gray testified that he never saw a gun.   Joyner's statement to the police identified [Petitioner] from a photographic array on September 2, 1997, after he was arrested on a drug charge. His statement did not mention the argument he testified that he had heard before the shooting.   Joyner said he received and expected nothing for his statement and testimony.

Gray was arrested on outstanding warrants for possession of heroin and gave a statement to police on August 14, 1997.   Gray testified that he knew [Petitioner] because he had seen him selling drugs in front of the building Brantley was going to buy.   He said he was not promised anything for his statement and days, apparently about two to three cells from [Petitioner], he overheard [Petitioner] on the phone saying that he had "messed his life up, he didn't want his family messed up," and that he had made a big mistake.   Until trial, Gray never mentioned that he had overheard [Petitioner].   The day after he gave his statement to the police, Gray was released from custody on his own recognizance.

[At trial,] Kurbansade said she told the police what she witnessed on the night of the murder, but claimed that she was "real high" on that night and only told the police what she thought they wanted to hear because she was sick and threatened that she would be jailed.   Detective Gialanella denied threatening to lock up Kurbansade if she did not cooperate.   He described her as "[v]ery nervous, very upset, [and] scared" while she was giving her statement.   Kurbansade asserted in her statement that she heard about eight shots, started to run and saw [Petitioner] running while

2

holding a gun in his right hand.   She picked [Petitioner]'s photograph from an array as the person she had seen running from the scene.

At trial, Kurbansade admitted she had known [Petitioner] about five years and that he sold heroin in the area.   Kurbansade partially recanted her prior statement, denying the truth of the parts of her statement which implicated [Petitioner], but confirmed that [Petitioner] sold heroin in the area.

The medical examiner testified that Brantley's death was caused by a bullet to the brain fired from a distance greater than one and a half feet.   Louis Alarcon, a ballistics expert, testified that six shell casings found at the scene were fired from a semi-automatic 9mm pistol, but he was not sure whether the bullet removed from Brantley's brain was fired from a casing found at the scene.   Based on the shell casings location, Alarcon opined that the shots were fired while the shooter was moving.

(Appellate Division Opinion, Document 4 attached to ECF No. 9 at 3-6).

Following his arrest, Petitioner was indicted in Essex County on the following charges: murder in violation of N.J. Stat. Ann. § 2C:11-3(a)(1) and 3(a)(2), unlawful possession of a weapon in violation of N.J. Stat. Ann. § 2C:39-5(b), and possession of a weapon for an unlawful purpose in violation of N.J. Stat. Ann. § 2C:39-4(a).   (*Id.* at 1-2).   Based on the facts recounted above, Petitioner was found guilty of all counts following a trial by jury.   (*Id.* at 2).   At the sentencing hearing, Petitioner also pled guilty to a charge issued in a prior indictment for unlawful possession of a weapon.   (*Id.*).

Petitioner thereafter filed a direct appeal, and the Appellate Division affirmed.   (Document 4 attached to ECF No. 9).   The New Jersey Supreme Court thereafter denied Petitioner's petition for certification.   (Document 5 attached to ECF No. 10).   On July 19, 2002, Petitioner filed a first petition for post-conviction relief.   (*See* Document 7 attached to ECF No. 9 at 3).   The PCR court denied that Petition, and Petitioner appealed.   (*Id.* at 3-4).   On May 21, 2010, the New Jersey

3

Appellate Division affirmed the denial of PCR, but remanded to the trial court several claims which Petitioner had not raised in his PCR petition based on Petitioner's assertion that the issues had only not been raised because of ineffective assistance of PCR counsel.   (*Id.* at 9).   Prior to the remand hearing, Petitioner filed a petition for certification, which was denied by the New Jersey Supreme Court on October 7, 2010.   (Document 8 attached to ECF No. 9).

Following the remand, the PCR court again denied Petitioner PCR relief on March 12, 2012.   (Document 9 attached to ECF No. 9).   Petitioner appealed, and the Appellate Division affirmed the denial of Petitioner's PCR petition on October 21, 2014.   (Document 10 attached to ECF No. 9).   Petitioner again filed a petition for certification, which was denied on March 27, 2015.   (Document 11 attached to ECF No. 9).   Petitioner thereafter filed this petition for a writ of habeas corpus on or about May 8, 2015.   (ECF No. 1).

## II.  DISCUSSION

### A.  Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.   *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012).   Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to

4

the determinations of the state trial and appellate courts.  *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court.  *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015).  "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."  *Id.*   Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1).

**B.   Analysis**

**1.   Petitioner's lay opinion and prior bad acts claims**

Petitioner first claims that the trial court erred in permitting Joyner to testify that the argument he overheard between Petitioner and his victim was "about some drugs."   Petitioner argues that this amounts to Joyner's opinion, and was therefore inadmissible lay opinion testimony which was further exacerbated by later testimony establishing that Petitioner dealt drugs in the area where the shooting took place which Petitioner asserts amounted to improper prior bad acts testimony.   Federal habeas relief is not available on the basis of violations of state law, and as such an erroneous evidentiary ruling by a state court would only be sufficient to require habeas relief where the error in question rose to the level of a violation of the petitioner's Due Process rights.   *See Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *see also Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009); *Keller v. Larkins*, 251 F.3d 408, 413, 416 n.2 (3d Cir.), *cert. denied*, 534 U.S. 873 (2001).   A state evidentiary ruling can only be said to deny a petitioner Due Process where the error involved was so grave or pervasive that it effectively denied the petitioner a fundamentally fair trial.   *Keller*, 251 F.3d at 413.   Here, Petitioner alleges that Joyner's testimony that he believed the argument between Petitioner and his victim was about drugs should not have been admitted as it amounted to lay opinion testimony and the trial court's admission of evidence that Petitioner dealt drugs in the area of the shooting compounded that error and deprived him of a fair trial.   This Court will deal with each contention in turn.

Petitioner first asserts that Joyner's testimony was inadmissible lay opinion testimony. Petitioner specifically decries testimony by Joyner that the argument between Petitioner and his

victim shortly before the shooting "had to be about some drugs what it sound like" and that this conclusion was based on "what [Joyner] overheard." (*See* Document 4 attached to ECF No. 10 at 38). Trial counsel did not object to this testimony. (*Id.*). Under New Jersey's evidentiary rules, lay opinion testimony is only permissible where that testimony is "based on the perception of the witness and . . . will assist the jury in performing its function." *State v. McLean*, 16 A.3d 332, 456 (N.J. 2011). In this case, Joyner testified about a conversation he overheard, which he characterized as being about drugs based on the portion of the conversation he heard. When asked, Joyner agreed that he came to that conclusion not based on prior knowledge of Petitioner, but instead on what he actually heard in the argument. Thus, to the extent that his testimony *was* an opinion as opposed to an oddly worded description of what he heard, Joyner's testimony was clearly based upon his perception of events. As the testimony in question clearly went to Petitioner's motive for shooting the victim, Petitioner's testimony would clearly assist the jury in determining an issue before it: Petitioner's reason for shooting the victim. As such, Joyner's testimony did not run afoul of the New Jersey rules of evidence as inadmissible lay opinion. As the statement would likewise have been admissible under the analogous federal rule, *see* Fed. R. Evid. 701 (permitting lay opinion testimony where a non-expert's opinion is based on his perception, is helpful to understanding his testimony or a fact in issue, and is not based on specialized expertise), it does not appear that this "opinion" testimony's admission was sufficient to render Petitioner's trial fundamentally unfair, and Petitioner is not entitled to habeas relief on that basis.

Petitioner also challenges Joyner's testimony and that of several other witnesses to the effect that Petitioner was a known drug dealer who operated in the area where the shooting took

place on the ground that this testimony amounts to improper prior bad acts testimony.   As the Appellate Division explained to Petitioner on direct appeal, although evidence of prior bad acts is generally not admissible under New Jersey law to prove that a person acted in conformity with those acts during the events in question, prior bad act testimony may be admitted for the purpose of establishing motive.   *See* N.J. R. Evid. 404; *State v. Cofield*, 605 A.2d 230, 235 (prior bad act testimony admissible where it is relevant to a material issue, similar in kind and reasonably close in time to the offense charged, the evidence of other crimes is clear and convincing, and the probative value is not outweighed by apparent prejudice).   As the State Courts determined that the evidence was admissible under this standard, and as that conclusion does not appear to have been erroneous, Petitioner has failed to show that the admission of this evidence to show his motive for shooting the victim, as a result of an argument over his dealing drugs in front of the home the victim was purchasing, was improper.   As such, the state court's admission of the prior bad act testimony is insufficient to establish Petitioner's entitlement to habeas relief.

## 2.  Petitioner's ineffective assistance of counsel claims

Petitioner's also contends that he received ineffective assistance of counsel prior to and during his criminal trial.   The standard which governs such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).   To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.   This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."   *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).   To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his

8

defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015). Petitioner raises several

claims of ineffective assistance of counsel, each of which this Court will address in turn.

Petitioner first asserts that his counsel was ineffective in failing to fully investigate the State's ability to introduce prior bad act testimony as indicative of motive.  Had counsel been fully aware of the admissibility of this testimony, Petitioner argues, she would not have pursued the suppression of his statement to the police, but instead would have been able to use that statement to support her argument that the police had fabricated evidence and in support of either a self-defense theory or in seeking the lesser included passion provocation manslaughter charge. Although Petitioner asserts that this claim is based on counsel's failure to investigate, it appears that what Petitioner truly takes issue with in this claim is counsel's strategic decisions to seek the suppression of his statement, and to not pursue a self-defense theory.

Initially, the Court notes that to the extent that Plaintiff suggests that counsel failed to "investigate" the ability of the prosecution to introduce other crimes evidence into the record, the trial record does not support his assertion.  It is clear from counsel's response to initial attempts by the state to elicit testimony regarding Petitioner's history of drug dealing that counsel was well aware of the fact that certain witnesses could testify that Petitioner was known for such activity. (*See* Document 5 attached to ECF No. 10 at 8-10).  Counsel objected to that testimony, opposed it during a short mid-trial hearing on the purported other crimes evidence, and effectively cross-examined the witnesses on that issue.  (*Id.* at 10-17).  Thus, there does not appear to have actually been any failure to investigate in this case, and Petitioner's claim must rise and fall on his assertion that, in light of the available other crimes testimony, counsel should have pursued a self-defense theory of the case and used his statement to the police to do so.

"*Strickland* and its progeny make clear that counsel's strategic choices will not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better." *Rolan*

*v. Vaughn*, 445 F.3d 671, 681-82 (3d Cir. 2006).   Indeed, as the *Strickland* Court noted "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."   466 U.S. at 690-91.   Thus, to show that counsel was ineffective in this instance would require Petitioner to essentially show that it was not a reasonable strategy to eschew self-defense in favor of a general denial, which, given the fact that Petitioner has not shown that counsel failed to investigate the law or facts, is a high bar indeed.

As the Appellate Division noted on PCR, there is no reasonable probability that a self-defense theory of the case would have been more successful than counsel's strategic decision to pursue a general denial.   (*See* Document 10 attached to ECF No. 9 at 7).   Under New Jersey law, a "person may justifiably use force against another if he reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."   *State v. Galicia*, 45 A.3d 310, 325 (N.J. 2012).   To establish a self-defense case, then, a defendant must have had "an actual, honest, reasonable belief in the necessity of using force."   *Id.* (internal quotations omitted).   The use of deadly force, such as that which Petitioner used here, is not justifiable "unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily injury and is not justifiable if the actor knows he can avoid the necessity of using it with complete safety by means of a retreat."   *Id.* (internal quotations omitted).

In this case, the facts elicited at trial show that, prior to the shooting, Petitioner and his victim had separated, Petitioner had essentially escaped the argument, and his victim had gotten

into his car and begun to drive away when Petitioner fired upon him.   Indeed, at least one witness testified that Petitioner stated that he "got his fat ass" after the shooting.   (Document 10 attached to ECF No. 9 at 2-3).   Given these facts, it is clear that a self-defense theory of the case was not tenable under the circumstances.   Not only had the argument ended prior to Petitioner's firing upon the victim, but Petitioner had clearly already escaped any harm the victim may have presented, and the victim was clearly leaving the area when Petitioner fired upon him.   Thus, under the circumstances, Petitioner could not have had a reasonable belief that his life was *presently* in danger, let alone in such danger as to warrant an application of deadly force.   There is no reasonable probability that a jury, given the testimony at trial, would have accepted a self-defense argument in light of these facts.   Giving the proper deference to the Appellate Division's determination that self-defense was not a realistic strategy under the circumstances, a finding which is fully supported by the relevant facts, this Court cannot find that counsel was unreasonable in choosing not to pursue a self-defense theory in Petitioner's case, and counsel was not deficient in pursuing a different strategy here.   Likewise, because a self-defense theory is untenable under the facts of this case, Petitioner suffered no prejudice as a result of counsel's strategic decision, and thus Petitioner cannot show that counsel was ineffective for that reason as well.[1]   *Judge*, 119

---

[1] The admission of Petitioner's statement would not change this fact.   Even if the jury accepted Petitioner's claim that the conflict between he and the victim had resulted in the victim shooting at him on a previous occasion, a self-defense theory under New Jersey law is concerned with the danger facing a criminal defendant *at the time of his use of force*.   *Galicia*, 45 A.3d at 325. Thus, while prior violence between Petitioner and his victim may weigh on Petitioner's subjective beliefs, the reasonableness of any belief that he was in danger would still be negated by the fact that Petitioner had safely departed the argument on the night of the shooting, and the victim was driving away at the time that Petitioner fired upon him.   Petitioner's statement that he "got his fat ass" likewise suggests that Petitioner's decision to shoot the victim was motivated by personal animus rather than a reasonable fear of grave danger to Petitioner.

12

F. Supp. 3d 280-81.   Counsel pursued a reasonable strategy under the circumstances, and Petitioner's after the fact desire that counsel had pursued a different, less reasonable theory of the case is not grounds for a finding of ineffective assistance, and Petitioner is therefore not entitled to relief on this ground.   *Rolan*, 445 F.3d at 681-82.

      In his next ineffective assistance claim, Petitioner assert that counsel failed to advise him to tell the truth during his suppression hearing testimony, and, as a result, Petitioner perjured himself during that hearing in support of his motion to suppress.   Petitioner further asserts that, because he was not advised to tell the truth, he could in turn not testify on his own behalf at trial because counsel advised that his suppression hearing testimony could be used against him.   The lynchpin in Petitioner's argument, however, is his assertion that he falsely testified at the suppression hearing that he had never gotten into an altercation with the victim before the night of the shooting.   Petitioner's argument, thus, relies essentially on the assertion that because counsel allegedly failed to tell Petitioner that his suppression testimony could only be used against him if he testified to the contrary at trial, Petitioner chose to lie on the witness stand, and thus precluded himself from testifying at trial to facts which purportedly would have aided either a self-defense or passion provocation theory of defense.

      Petitioner's claim thus rises and falls with his underlying premise that he was not told that he had to testify truthfully during the suppression hearing, and likewise rests on the basic fact that the only thing Petitioner alleges kept him from testifying at trial was that his admittedly perjured statements at the suppression hearing could be used against him at trial.   Petitioner does not assert in his petition that counsel advised him to lie, instead stating that he didn't even know he would testify at the suppression hearing until he was called, and that it was he, believing it in his best

interests, who chose to perjure himself on the stand at that time.

Petitioner's claim thus boils down to the assertion that counsel failed to tell him he was required to tell the truth on the stand, and that if he didn't his perjured statements could be used against him if he testified at trial.   As the New Jersey Appellate Division observed in Petitioner's second PCR appeal (Document 10 attached to ECF No. 9 at 6), Petitioner's assertion that he was not aware of the requirement that he testify truthfully as a witness is completely incredible, especially in the face of the fact that witnesses are specifically informed of that requirement when they are placed under oath.   Petitioner now seeks to profit from his choice to perjure himself by stating that counsel's completely accurate advice that Petitioner's suppression hearing testimony could be used against him if he contradicted it at trial becomes ineffective because he was not told to tell the truth before the suppression hearing.   This Court will not permit him to do so. Petitioner, as with all witnesses, was certainly aware of the requirement that he tell the truth on the stand, and in light of Petitioner's testimony at the suppression hearing, counsel's advice that Petitioner's prior inconsistent statements could be used against him if he testified at trial was entirely accurate and not ineffective assistance.   *See, e.g., State v. Gross*, 577 A.2d 806, 808-814 (N.J. 1990) (prior inconsistent statements admissible under New Jersey evidence rules).

As Petitioner has thus not shown that his counsel was deficient, this claim of ineffective assistance must fail.   *Judge*, 119 F. Supp. 3d at 280-81.   Because Petitioner has failed to show ineffective assistance of counsel, Petitioner's argument that the New Jersey Appellate Division erred in denying this claim (Petitioner's Ground Five) must likewise fail.   Likewise, because Petitioner has failed to establish even a prima facie case of ineffective assistance of counsel insomuch as he has failed to establish deficient performance, his argument that the New Jersey

14

Courts should have granted him an evidentiary hearing on this issue is without merit. *See State v. Precise*, 609 A.2d 1280 (1992) (New Jersey PCR claimant only entitled to an evidentiary hearing where he has made out a prima facie case of ineffective assistance of counsel); *see also Palmer v. Hendricks*, 592 F.3d 386, 393 (3d Cir. 2010) (section 2254 claimant not entitled to an evidentiary hearing where he fails to make out a prima facie case).

Petitioner also asserts that his trial counsel was ineffective in failing to request a curative instruction to remedy "inadmissible hearsay" which Petitioner asserts was implied by the testimony of various witnesses. Specifically, Petitioner asserts that testimony from an investigator who prepared a photo array about the creation of that array, and testimony of a police detective who questioned Petitioner implied that there were witnesses who did not testify at trial who had indicated that Petitioner was the shooter. On appeal from Petitioner's PCR, the Appellate Division rejected this claim because the "substantial evidence" in the record indicating that Petitioner was the shooter clearly indicated that it was not likely that a curative instruction would have in any way affected the outcome of Petitioner's trial. (Document 10 attached to ECF No. 9 at 7). Nothing in the record suggests that this conclusion was in error. The testimony of the witnesses who were present at trial established that, on the night of the shooting, Petitioner argued with the victim, was seen walking away from that argument with a silver hand gun, and after the shooting Petitioner stated that he had "got[ten]" the victim. The trial testimony also included testimony from a witness that Petitioner made inculpatory statements regarding the events while in jail. Several of these witnesses were familiar with Petitioner from before the night of the shooting. Given the strong evidence of Petitioner's guilt which results from all of this testimony, the implication of other unnamed witnesses is not so inescapable as Petitioner seems to suggest.

15

Regardless, because there was significant testimony establishing Petitioner's guilt presented at trial, it is clear that Petitioner has failed to show that, but for counsel's "failure" to request a limiting instruction as to the allegedly implied hearsay, the outcome of Petitioner's trial would not have been different.   As there is no reasonable likelihood that a limiting instruction would have changed the outcome of Petitioner's trial given the strong testimonial evidence of his guilt, Petitioner has failed to show that he was prejudiced by counsel's alleged failure, and Petitioner therefore has failed to show ineffective assistance of counsel.   *Cross*, 308 F.3d at 315; *Judge*, 119 F. Supp. 3d at 280-81.

Petitioner next claims that counsel was ineffective in failing to ask the victim's widow on cross examination about her late husband's reputation for violence, which Petitioner believes would have aided in pursuing a lesser included charge of passion-provocation manslaughter rather than murder.   In his petition, however, Petitioner does not provide sufficient elaboration as to this alleged reputation for violence other than to suggest that the victim was known around the neighborhood for "assaultive behavior."   Petitioner also fails to even suggest, let alone actually aver as to what testimony he expects counsel would have elicited from the victim's widow as to the allegedly violent reputation of the victim.   Given the relationship between the witness and the victim, it is highly doubtful that such questioning would have borne fruit, and certainly doubtful that it would have provided any testimony sufficient to reasonably effect the outcome of Petitioner's trial.   Absent more information other than Petitioner's bald assertion of a reputation for assaultive behavior, Petitioner's claim is entirely speculative and therefore Petitioner has failed to show that counsel was ineffective in pursuing this line of questioning or that he suffered prejudice as a result of this alleged failing.

Even had Petitioner provided more information, it is doubtful he could have shown that the victim's reputation would provide support for a passion provocation theory.   Under New Jersey law, passion provocation manslaughter has the following elements: "(1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying." *State v. Josephs*, 803 A.2d 1074, 1109 (N.J. 2002).   As a general rule, "words alone, no matter how offensive or insulting, do not constitute [sufficient] provocation." *State v. Crisantos*, 508 A.2d 167, 171 (N.J. 1986).   Likewise, where the alleged provocation arises out of mutual combat, that combat must be on equal terms without unfair advantage to be adequate provocation.   *Id.*

Here, Petitioner engaged in an argument with the victim, and then fired upon him as he drove away.   The record suggests that what passed between them was little more than words. Regardless of the victim's reputation, the alleged provocation appears to be entirely inadequate as a matter of law.   As such, even had Petitioner shown that the victim's wife could have provided any useful testimony as to her husband's reputation, it would have provided little if any aid to Petitioner's cause.   Thus, Petitioner has not shown *Strickland* prejudice, and this claim of ineffective assistance must fail.

In a related argument, Petitioner again claims that counsel should not have sought the suppression of his statement to the police, but instead used it to support his quest for a passion-provocation verdict.   Petitioner asserts that as his statement contains his assertion to the police that he had a history of conflict with the victim, and Petitioner's claim that the victim had shot at him on a previous occasion.   Considering this statement would essentially have provided ample

17

support for the State's theory that Petitioner had killed the victim because of their history of

fighting over Petitioner's drug sales, and would have suggested Petitioner's guilt as to the shooting,

if not as to purposeful or knowing murder, there was ample reason for counsel to choose not to use

the statement, even if it may have, in Petitioner's eyes, offered support for a conviction as to the

lesser included offense. Ultimately, though, a passion-provocation defense depends on whether

Petitioner was provoked on the night of the shooting, not on the bad blood between Petitioner and

his victim that existed before that night. *Josephs*, 803 A.2d at 1109.   Indeed, Petitioner certainly

had time to cool off between the alleged shooting the night before and the argument between he

and the victim, which would undercut any support the shooting might provide to Petitioner's desire

for a conviction on the lesser charge. *Id.*   Ultimately, the only provocation on the night in

question was Petitioner's argument with the victim, which was insufficient to support a finding of

passion provocation.   As such, the tentative and weak support the statement would have provided

a passion-provocation defense was severely outweighed by the prejudicial effect Petitioner's

statement would have had insomuch as it would have provided ample support that Petitioner chose

to kill the victim based on his history of conflict with the victim over Petitioner's drug sales.

Thus, counsel acted reasonably in choosing to seek the suppression of the statement rather than to

use it in support of a passion-provocation defense, and Petitioner's claim is without merit.

    In his final ineffective assistance claim, Petitioner asserts that counsel was ineffective

insomuch as counsel did not tell him that they would not be pursuing a self-defense theory of the

case prior to the plea cutoff date, and as a result he did not give an offered plea agreement adequate

consideration.   In support of his assertion, Petitioner states that, had he known that counsel would

not pursue self-defense, "there exist[s] the probability that had counsel done so [P]etitioner would

have accepted the State's offer."   (Document 2 attached to ECF No. 1 at 37).   Petitioner does not

unequivocally state that he would have accepted the alleged plea offer in such a case, but does

state that he "believed [that the self-defense theory] would be successful or at worse [he] would

be found guilty of no-more than passion/provocation manslaughter."   (*Id.*).   Petitioner's own

submissions run counter to this argument.   In replying to the answer in this matter, Petitioner

provided this Court with a letter from his trial counsel which clearly states that Petitioner was

informed of counsel's decision not to pursue self-defense "on several occasions, namely March 2,

March 12, March 26, May 19, and May 22" 2008.   (Document 2 attached to ECF No. 13 at 74).

Thus, it appears that Petitioner was informed of counsel's belief that self-defense was untenable

prior to the plea cut-off date of March 27, 1998.   (*See* Document 21 attached to ECF No. 9 at 58).

Even if Petitioner had not been told of counsel's decision not to pursue self-defense,

Petitioner has not made out ineffective assistance of counsel.   Criminal defendants do not have a

constitutional right to be represented by a lawyer who agrees with the defendant's trial strategy.

*See United States v. Leggett*, 162 F.3d 237, 246-47 (3d Cir. 1998).   Whether made before or after

the plea cut-off date, counsel made a strategic decision not to pursue self-defense, which, as this

Court explained above, was entirely sound.   Even if facts were as Petitioner asserts, and counsel

did not make this decision until after the plea cut-off date, Petitioner would not be entitled to relief

because counsel's performance was not deficient as choosing to forego self-defense was an entirely

appropriate decision here.   Even under the facts as Petitioner asserts, Petitioner chose not to accept

the offered plea agreement and to proceed to trial, and counsel's "after the fact" change of strategy

would not become deficient because Petitioner in hindsight wishes he had known of that decision

before he made a decision to reject a plea agreement.   Ultimately, Petitioner does not claim that

he was not advised of the plea agreement, nor that he was unaware of its terms, or of the comparative exposure he faced.   Instead, he reiterates his unhappiness with counsel's choice of trial strategy and his own misguided belief that self-defense would have proven a more effective means of contesting the state's proofs.   Counsel disagreed and pursued a different strategy after Petitioner chose to reject the offered plea agreement.   The documents submitted indicate that Petitioner was most likely aware of this fact prior to rejecting the plea, but even if he was not, counsel was within the strictures of professional competence and her legal authority to choose to pursue a different strategy once it became apparent that self-defense was an untenable defense given the facts at issue.   Thus, Petitioner has failed to establish deficient performance, and Petitioner has failed to show he suffered ineffective assistance of counsel on this basis.

### 3.   Petitioner's claim that the Appellate Division erred in its second PCR appeal opinion

In his ground four, Petitioner asserts that the New Jersey Appellate Division erred in its second PCR opinion by concluding that it had already determined in its first PCR opinion that counsel had not been ineffective in seeking the suppression of Petitioner's statement to the police, which Petitioner argues culminated in his lying on the stand and in turn being prevented from testifying at trial based on his previous perjured testimony.   Essentially, Petitioner argues that in its first PCR opinion, the Appellate Division had considered this argument in reference to Petitioner's claim that PCR counsel had been ineffective in failing to raise the issue fully, whereas in its second opinion, the Appellate Division was faced with Petitioner's substantive argument that counsel was ineffective in challenging Petitioner's statement to the police because Petitioner believes it would support a self-defense theory of his case.   In the end, however, this is a

20

distinction without a difference.   In both instances, the Appellate Division determined that the decision to seek the suppression of the statement was ultimately a strategic decision made by counsel that did not amount to ineffective assistance of counsel.   As this Court has explained above in reference to Petitioner's claim that counsel was ineffective in seeking the suppression of the statement and in allegedly failing to tell Petitioner not to lie, the Appellate Division was ultimately correct in concluding that Petitioner has failed to show that his counsel was deficient in seeking suppression and in not telling Petitioner what he certainly knew after being sworn in – that he should not lie on the stand.   As such, Petitioner has failed to show that the Appellate Division erred in denying his argument in its second opinion for the same reason presented in the first – that counsel's decision was sound trial strategy and not ineffective assistance.   Petitioner has pointed to no Supreme Court case law of which this course runs afoul, and this Court is aware of none.   As such, Petitioner has failed to show that the Appellate Division erred, let alone that its decision amounted to an unreasonable application of Federal law.

Finally, to the extent that Petitioner asserts that the Appellate Division did not notice the change in some of the underlying assertions in his argument between the two opinions, he is simply incorrect.   As the Appellate Division noted, Petitioner in the second appeal "assert[ed] a different reason" that counsel was ineffective than he had in the first appeal.   (Document 10 attached to ECF No. 9 at 5).   Nothing in the second opinion suggests that the Appellate Division failed to perceive that Petitioner had, to some small extent, changed his argument in so much as he argued in the second opinion that the statement supported self-defense rather than that it supported a theory of Petitioner being railroaded by the police, nor that the argument was no longer connected to Petitioner's claims of ineffective assistance of PCR counsel.   Ultimately, these changes did not

change the underlying fact that counsel made a strategic decision subject to deference under the *Strickland* standard and that Petitioner had otherwise failed to establish ineffective assistance of counsel for the reasons discussed above.   As such, Petitioner's ground four provides no basis for habeas relief as the Appellate Division's decision was neither an unreasonable application of the law nor the facts.

**4.   Petitioner's jury instruction claims**

Petitioner also alleges that the trial court erred in two respects in charging the jury – that the trial court failed to instruct the jury as to the expectation of favorable treatment by the state arising from various witnesses' testimony at trial and that the court instructed the jury as to murder in such a way that one of the ways in which the jury could find murder would be indistinguishable from aggravated or reckless manslaughter.   "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."   *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001).   Where a Petitioner alleges that a state court gave an erroneous jury charge, habeas relief is only warranted when "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."   *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). That the charge at issue may be "undesirable, erroneous, or even universally condemned" is insufficient to warrant relief in and of itself, and a reviewing court must consider an allegedly improper instruction in the context of the overall jury charge to determine whether a due process violation occurred.   *Id.*

Petitioner first alleges that the trial court should have *sua sponte* charged the jury as to the

22

expectation of better treatment by the state that some of the state's witnesses had in relation to their trial testimony.   Petitioner specifically points to Joyner and Gray, both of whom were facing criminal charges when they came forward.   It should be noted that the trial court did given an instruction to the jury dealing with how they should evaluate the cooperation of these witnesses. Specifically, the trial court told the jury that "some of the witnesses who testified may have had at some point in time . . . pending charges.   Michael Joyner was in jail when he came forward to the police . . . you [also] heard Glenn Gray who was picked up on an open warrant and then brought down for questioning, after he gave a statement and [was] arrested on that charge.   [Were they] looking for favorable consideration on [those] charge[s]?"   (Document 4 attached to ECF No. 9 at 25).   The trial judge also informed the jury that they should use common sense to determine which witnesses were credible, and in so doing should consider the witnesses' demeanor, whether the witness's interests aligned them to one side or the other, whether the witness had a motive to testify truthfully, whether the witness's testimony was corroborated, and the ability of the witness to perceive the events about which he testified.   (*Id.* at 26).   Trial counsel did not object to the jury charge on the basis that Petitioner now raises.

Reading the entire jury charge in context, it is clear that the trial judge gave the jury a more than adequate charge regarding their ability to question the credibility of various witnesses based on their interest in gaining favorable treatment by the state.   The trial judge specifically told the jury to consider the motives of the witnesses to tell the truth or fabricate, to consider whether the interests of the witnesses aligned with those of the State or Petitioner, and to directly question whether Joyner or Gray were looking for favorable treatment on their criminal charges in testifying against Petitioner.   Given the full context of the charge it is clear that, erroneous or not, the

23

favorable treatment charge at issue here was not so gravely erroneous that it deprived Petitioner of a fair trial.   That the Appellate Division determined that the charge comported with state law and that trial counsel did not object both support this conclusion.   As this charge did not deprive Petitioner of a fair trial, no Due Process violation occurred, and Petitioner is not entitled to habeas relief.  *Duncan*, 256 F.3d at 203.

In his final claim, Petitioner alleges that the jury charge in his case essentially made knowing murder indistinguishable from reckless or aggravated manslaughter.   Essentially, Petitioner argues that both knowing murder and reckless/aggravated manslaughter under New Jersey law include one category of conduct: where a defendant acts in a manner which causes serious bodily harm resulting in death, with the difference between the two being whether the Defendant acted knowingly or recklessly.   *See, e.g., State v. O'Carroll*, 896 A.2d 1125, 1134-35 (N.J. App. Div. 2006) (murder includes knowingly causing serious bodily injury resulting in death, whereas reckless manslaughter includes causing serious bodily injury resulting in death based by consciously disregarding a substantial and unjustifiable risk of death and aggravated manslaughter includes recklessly causing serious bodily harm resulting in death under circumstances manifesting an extreme indifference to human life).   Because the difference between the offenses is a question of mental state, whether Petitioner acted knowing that his firing upon the victim could result in the victims death, or whether Petitioner simply acted with reckless disregard for the possibility of causing death, the question here is whether the trial court sufficiently delineated the two mental states in the charge.

As to knowing murder, the trial court explained to the jury that murder had three elements: that Petitioner caused the victim's death or cause serious bodily injury to the victim resulting in

death, that Petitioner did so purposely or knowingly, and that Petitioner did not do so in the heat of reasonable provocation.   (Document 8 attached to ECF No. 10 at 84-85).   As to the mental state required for murder, the trial court explained as follows:

> What are purpose and knowledge?   They are not things that you can see, [they are] states of mind.
>
> Remember what I said to you earlier about direct evidence and circumstantial evidence, how do we prove someone's state of mind?   Someone is intending, doing something on purpose? Usually, not by direct evidence unless the person happens to see. Usually we prove a state of mind by circumstantial evidence, by all the things going around at the time, all of the facts, what the person does.   For example, if I'm leaving my house in the morning before I walk out the door I pick up an umbrella and say good bye to my wife, she knows from my actions and from the circumstances what's going on in my mind, she knows what I'm thinking.   First of all, she sees me pick up the umbrella and raincoat, maybe she looks out the window and sees what the weather is like, she knows or believes that it is raining at the time.   She figures out circumstantially [rather than by direct evidence what I'm thinking].   . . . usually we . . . figure out what's going on in someone's head by circumstantial evidence.
>
> What does it mean to act purposely?   You act purposely when you have a conscious object to do something, when you do it intentionally, when you do it on purpose.
>
> What does it mean to act knowingly?   It's when you know what you're doing, you're aware of, you comprehend what you're doing and what happens as a result.
>
> . . . .
>
> If . . . I take [a] gun [and] I point the same gun at [a person and] I don't intend to kill him but I know that if I point a loaded gun at him and I pull the trigger and bullets are going to come out and strike him, even if it's not my purpose to [kill the man], if I know [what] I'm doing when I do that and I'm aware, I comprehend what's going to happen, I pull the trigger and I know he's going to die . . . that's . . . an example of [knowing murder].

25

. . . .

> A killing with a deadly weapon such as a handgun in itself permits you to draw an inference that a defendant's purpose was to take a life or cause serious bodily injury to cause death, a deadly weapon is known to be capable of producing death.

(*Id.* at 85-88).

As to the two types of manslaughter, both of which require recklessness, the trial court described recklessness as follows:

> A person who causes another's death does so recklessly when he's aware of a justifiable risk that death will occur by his conduct. It must be of such a degree that considering the state and circumstances of the defendant's conduct and the circumstances knowing to him[,] his disregard of that risk is a gross deviation from that which a person would do under the circumstances. In other words, you have to find the defendant was aware and consciously disregarded the risk of causing death. If you find that he has caused the risk, consider the nature and circumstances known to him. You have to consider whether in light of those factors the defendant['s conduct] was a gross deviation from what a reasonable person would have done under the circumstances.

(*Id.* at 92-93).

While this Court notes that the line between reckless disregard of the consequences of one's action and knowing that death will result from one's actions may be more fine than that between reckless disregard and purposeful murder, looking at the charges in context, the trial court clearly delineated the differences between recklessly and knowingly taking another's life by causing serious bodily injury. Under the circumstances, the jury was informed that if they found that Petitioner knew that shooting the victim would probably kill him, he would be guilty of knowing murder, but if Petitioner had only acted with a reckless disregard of a risk of death, he would be guilty of one of the two species of reckless manslaughter. Thus, placed in context, the trial court

discussed with the jury the difference between the two crimes, and left to the jury the question of whether Petitioner's actions were knowingly or purposefully undertaken, or were simply the result of a reckless disregard for the consequences of Petitioner's actions.   Thus, the crimes of murder and reckless or aggravated manslaughter were distinguishable from one another, and no Due Process violation can be said to have occurred based on the Court's jury instruction as to knowing murder.   *Duncan*, 256 F.3d at 203.   Petitioner's final claim therefore does not entitle him to habeas relief, and must be denied.[2]

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right as jurists of reason could not disagree that Petitioner's claims are without merit and he has thus not shown that the issues presented deserve encouragement to proceed further.   This Court shall therefore deny Petitioner a certificate of appealability.

_____

[2]   In their answer, Respondents argue that this claim was procedurally defaulted.   Because this Court can and does deny Petitioner's claim as meritless, that this claim may not have been exhausted is immaterial.   *See* 28 U.S.C. § 2254(b)(2) (habeas claim may be denied on the merits "notwithstanding the failure of the applicant to exhaust").

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED, and Petitioner is DENIED a certificate of appealability.   An appropriate order follows.

Hon. Jose L. Linares,
United States District Judge